**Michael E. HUBBARD, Appellant,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, ADMINISTRATOR, et al.**

No. 85–5145.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 6, 1986.

Decided Dec. 5, 1986.

Rehearing En Banc Granted in Part
Jan. 6, 1987.

Peter B. Broida, Washington, D.C., for appellant.

Scott T. Kragie, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees.

Before WALD, Chief Judge, SCALIA * and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in the judgment filed by Chief Judge WALD.

SILBERMAN, Circuit Judge:

This case arises out of appellant Michael Hubbard's unsuccessful effort to obtain employment with appellee, the Environmental Protection Agency (EPA). Hubbard alleges that EPA violated two provisions of the Privacy Act[1] and that EPA and appellee Peter Beeson rejected his employment application in violation of his first amendment rights. Hubbard seeks damages against EPA for his Privacy Act claims. For his first amendment claim, Hubbard seeks damages against Beeson

under the *Bivens*[2] doctrine, and reinstatement against EPA. The district court, on cross motions for summary judgment, dismissed each of Hubbard's claims. Hubbard appealed. For the reasons set forth below, we affirm the district court's dismissal of Hubbard's Privacy Act and *Bivens* claims,[3] and reverse the dismissal of his first amendment-based claim for reinstatement.

## I.

Michael Hubbard is a detective employed by the District of Columbia Metropolitan Police Department. His assignments at the department have included investigating organized crime, narcotics trafficking, and other criminal cases. He participated in the highly-publicized 1981 investigation of alleged illegal drug use by employees and members of Congress. In 1982, Hubbard applied for a criminal investigator position with the EPA in Washington, D.C. Following EPA's normal evaluation procedure, Hubbard was ranked on a numerical scale reflecting his work, experience, and education and received a score that placed him in the class of "best qualified" applicants.

Hubbard's application was given to Peter Beeson, an EPA hiring official. Before his job interview, Hubbard's name surfaced during a conversation between Beeson and his fiancee, Laura Kiernan, a *Washington Post* reporter covering the Capitol Hill drug investigation. Kiernan's reaction to the mention of Hubbard's name caused Beeson to suspect that Hubbard had improperly discussed the investigation with the press.

---

* Justice Scalia was a judge of this Court when this case was briefed and argued, and is a designated Circuit Justice of this Circuit on the date of this decision. *See* 28 U.S.C. §§ 42, 43(b) (1982).

1. 5 U.S.C. §§ 552a(g)(1)(C), 552a(e)(2) (1982).

2. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

3. The panel is aware that a separate opinion issued today, *Spagnola v. Mathis,* 809 F.2d 16, (D.C.Cir.1986) holds to the contrary on this precise issue. Because both cases presented issues other than the one in conflict, the two panels after consultation decided to issue the two opinion despite the conflict. The judges on each panel recommend that the issue in Part III of *Hubbard* and Part II of *Spagnola* be heard *en banc* by the entire court so as to resolve the conflict.

In fact, Hubbard has admitted discussing the drug investigation with two assistants to syndicated columnist Jack Anderson. The parties in this case disagree about whether these discussions were authorized by Hubbard's superiors, or were more in the nature of unauthorized "leaks." Hubbard also wrote a letter to Congressman Robert Dornan naming the targets of the drug investigation. Hubbard does not contest appellees' assertion that this disclosure was unauthorized.

During Hubbard's subsequent interview, Beeson asked him if he knew the source of the leaks in the drug investigation. Hubbard replied that he did not leak information to the press and suggested that Beeson contact a Justice Department attorney, David Hopkins, for further information regarding his role in the drug investigation. Despite Hubbard's denial, Beeson remained concerned that Hubbard had leaked sensitive information about a criminal investigation, thus demonstrating (in Beeson's mind) Hubbard's lack of judgment and lack of concern for the rights of suspects. He decided not to hire Hubbard. Because Hubbard was a veteran, Beeson was required to document the reason for the rejection by completing a "passover document." In the document, Beeson wrote that Hubbard's rejection was due to his lack of experience investigating white collar crime. Beeson did not mention his concerns about Hubbard's judgment.

Hubbard asserts that this passover document was "inaccurate" because (1) it did not list the primary reason for his rejection, and (2) the reason listed was not itself sufficient grounds for rejecting him. The latter assertion requires some explanation. EPA's job vacancy announcement described the position for which Hubbard applied as requiring "[s]kill in conducting investigations involving major corporations, white collar crime, and fraud." This requirement could be met by applicants who demonstrated "[e]xperience in the investigation *either* of white collar crime by major corporate defendants *or* of major (class 1) felonies." (emphasis added). Because these were alternative requirements, Hubbard argues, he could not properly have been rejected for lack of only one of them. EPA responds that it considered the white collar crime requirement the more important of the two requirements, and in fact rejected other applicants solely because they lacked white collar crime investigating experience.

After learning of his rejection, Hubbard asked the Office of Personnel Management (OPM) to review the EPA passover decision. In response, OPM wrote to Hubbard's attorney stating that it had investigated the allegations of an improper passover but found no improprieties and, further, concluding that Hubbard did not meet the vacancy announcement's "mandatory requirement of skill in conducting investigations involving major corporations, white collar crime and fraud."

In January, 1983, Hubbard petitioned to the Office of Special Counsel ("OSC") of the Merit Systems Protection Board ("MSPB") alleging that his non-selection resulted from a prohibited personnel practice.[4] And in February, 1983, Hubbard filed this lawsuit in the district court. Five months later, OSC concluded there was no evidence of a prohibited personnel practice in EPA's hiring decision.

Hubbard's complaint asserted several claims, all of which were dismissed on summary judgment. The question before us is whether there is "a genuine issue as to a material fact," *Fink v. National Savings and Trust Co.*, 772 F.2d 951, 955 (D.C.Cir. 1985), which, if proved, would make out a cause of action. Of Hubbard's claims, we think three merit extended discussion: the Privacy Act section 552a(g)(1)(C) claim, the

---

4. Specifically, Hubbard alleged violations of 5 U.S.C. §§ 2302(b)(8), (10) and (11) (1982), which specify three prohibited personnel practices: the taking of reprisals for protected actions (whistle-blowing), discrimination based on conduct which does not adversely affect an applicant's performance, and taking a personnel action that violates any law, rule or regulation relating to the merits systems principles contained in 5 U.S.C. § 2301 (1982).

first amendment-based *Bivens* claim against Beeson, and the first amendment claim against EPA.[5]

## II.

Hubbard alleges a violation of the Privacy Act, 5 U.S.C. § 552a(g)(1)(C) (1982), which creates a civil cause of action for damages when a federal agency fails to maintain accurate records concerning an individual and, consequently, the agency acts adversely to that individual.[6] Hubbard claims he was injured as a result of the allegedly inaccurate passover document prepared by Beeson. He argues that because the passover document described his lack of experience in "conducting investigatings involving major corporations, white collar crime and fraud" as the reason for the rejection, it was inaccurate, and, as a consequence, he was denied employment. Assuming *arguendo* the passover document was inaccurate, Hubbard's Privacy Act claim presents us with two issues: whether Hubbard must exhaust specified administrative remedies before pursuing the claim, and whether Hubbard has met the Privacy Act's "causation" requirement.

### A.

The district court held that Hubbard was required to seek administrative correction of the allegedly inaccurate passover document before pursuing his Privacy Act damage claim in district court. Since Hubbard had not done so, the court dismissed the claim.

■ We believe the court erroneously applied to Hubbard's damage claim the exhaustion requirement applicable to section 552a(g)(1)(A) claims, which authorize courts to compel agency correction of inaccurate records. In *Nagel v. U.S. Department of Health, Education, and Welfare,* 725 F.2d 1438 (D.C.Cir.1984), we distinguished between Privacy Act suits seeking correction of agency records and suits seeking damages for inaccurate records. While plaintiffs must request agency amendment of allegedly inaccurate records before suing to compel amendment, "exhaustion of administrative remedies is not required where an individual seeks damages pursuant to 5 U.S.C. § 552a(g)(4)." *Id.* at 1441 n. 2. The district court therefore possessed, and should have exercised, jurisdiction over Hubbard's damage claim.

### B.

To make out a damage claim under the Privacy Act, the plaintiff must prove a

---

5. Hubbard's initial complaint alleged that OSC had violated 5 C.F.R. 5.1–5.3 by failing to investigate Hubbard's allegations. Five months later, OSC did complete an investigation and Hubbard thereupon stipulated in a Reply Memorandum that the claim was moot.

Later, Hubbard charged that OSC's investigation had been inadequate, and asked the district court to review its adequacy. The court chose not to rule upon this request. We believe Hubbard effectively waived all his complaints against OSC in his Reply Memorandum mentioned above, which declared "the case against the Special Counsel is moot absent further amendment of the complaint to state a claim attacking the sufficiency of the investigation, *a course Plaintiff will not pursue."* (emphasis added).

The district court also dismissed Hubbard's Veteran's Preference Act and regulatory claims against EPA and OPM on jurisdictional grounds. Hubbard does not appeal this ruling. Nor does

Hubbard appeal the court's dismissal of his claims for back pay under the Tucker Act and the Back Pay Act.

6. Section 552a(g)(1)(C) provides:

Whenever any agency

. . . . .

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and *consequently* a determination is made which is adverse to the individual

. . . . .

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction....

5 U.S.C. § 552a(g)(1)(C) (1982) (emphasis added).

"causal relationship between the allegedly erroneous record and an adverse determination based on that record." *Clarkson v. IRS,* 678 F.2d 1368, 1377 (11th Cir.1982) (quoting *Edison v. Department of the Army,* 672 F.2d 840, 845 (11th Cir.1982)). *See also Molerio v. FBI,* 749 F.2d 815, 826 (D.C.Cir.1984). The district court found that Hubbard "failed to demonstrate a causal relationship between the alleged errors in the passover document and his non-selection as an EPA criminal investigator." Appellant argues that summary judgment on this issue was inappropriate.

■ The district court perceived Hubbard's Privacy Act claim as an effort "to circumvent the administrative remedies provided by [the Civil Service Reform Act] for alleged 'prohibited personnel practices' and to attack collaterally the final decision of the OSC...." Although the court proceeded to analyze the merits of the Privacy Act claim, its causation analysis assuredly was influenced by its concern not to read the Privacy Act so as to bring it into conflict with CSRA. We think the court was, in that respect, correct. CSRA deprives the district court of jurisdiction to review prohibited personnel practices; more serious infractions are appealable to the Merit Systems Protection Board, with further review in the Courts of Appeal. Prohibited personnel practice claims may only be brought to the OSC, which has discretion (not normally reviewable by any court) to seek relief on behalf of a petitioner. *See Carducci v. Regan,* 714 F.2d 171, 175 (D.C. Cir.1983). Since Congress specifically chose to oust the district courts of jurisdiction to review government personnel practices, it would be anomalous to construe the pre-existing Privacy Act to grant the district court power to do indirectly that which Congress precluded directly: "the Privacy Act was not intended to shield [federal] employees from the vicissitudes of federal personnel management decisions." *Albright v. United States,* 732 F.2d 181, 190 (D.C.Cir.1984).

On the other hand, as the government concedes, the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record. But the obvious need to accommodate the two statutory schemes requires the district courts to carefully analyze the asserted causation link to be certain they are not exceeding their jurisdiction. *See R.R. v. Department of the Army,* 482 F.Supp. 770, 775 (D.D.C.1980) (Privacy Act damage remedy not available to circumvent Congress' intent to make Veterans Administration benefits determination unreviewable); *Bashaw v. United States Department of the Treasury,* 468 F.Supp. 1195, 1197 (E.D. Wisc.1979) (Privacy Act may not be used as vehicle to resolve the merits of employee's discrimination claim).

■ Although Hubbard strains to fit his case within the boundaries of the Privacy Act, his complaint really alleges only a wrongful personnel decision, not an invasion of privacy. The bad fit between the facts asserted by Hubbard and a colorable Privacy Act claim is revealed by Hubbard's failure to demonstrate the required causal link between the passover document and his failure to obtain employment.[7] Hubbard alleged that before he was interviewed, Beeson suspected that Hubbard had discussed the Capital Hill drug investigation with the press. Primarily because of this suspicion (according to Hubbard's version of the facts), Beeson eventually

---

7. Hubbard advances a *Chenery* theory, *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), to argue that the district court was required to look *solely* to the passover document and ignore other evidence when deciding whether this allegedly inaccurate passover document caused Hubbard's injury. But the district court was not engaged in an APA-governed review of an administrative decision. Instead, its task was to see if the causation element of a statutory claim was met. It was entirely proper for the court to examine all evidence in the record to decide whether Hubbard had made out a colorable claim for damages under the Privacy Act. *See, e.g., Edison v. Department of the Army,* 672 F.2d 840 (11th Cir.1982) (affirming district court's finding of lack of causation based on its examination of all factors influencing decision not to promote military officer).

decided not to hire Hubbard. After making this decision, Beeson prepared the passover document. From these alleged facts we believe the legal conclusion is clear: although the hiring decision caused the passover document to be prepared, the passover document did not cause the hiring decision. Rather, the passover document merely memorialized that decision.

Hubbard argues that because the Veterans Preference Act required Beeson to prepare a passover document, the passover document itself was an integral part of the rejection process. Without the passover document, Hubbard could not have been rejected. Therefore, the passover document, in appellant's view, caused his rejection. The fallacy in this argument lies in Hubbard's confusion between a *necessary step in* the rejection process, and a *cause of* the rejection. Although the passover document may have been a necessary step in the rejection process, it in no way influenced the substance of Beeson's decision to reject Hubbard.

█ Hubbard next asserts a causal link between the alleged inaccuracy of the passover document and OPM's subsequent rejection of his appeal of the hiring decision. Hubbard was entitled to proceed to trial in the face of a summary judgment motion only if he "set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). To avoid summary judgment, Hubbard must have set forth facts showing that OPM relied, in whole or in part, upon inaccuracies in the passover document in rejecting his appeal. *See Perry v. FBI,* 759 F.2d

1271, 1275 (7th Cir.1985). Yet nowhere in the record, nor, for that matter, in appellant's brief, does Hubbard put forward any facts that indicate but for inaccuracies in the passover document, OPM would have ruled in his favor. Indeed, Hubbard does not even squarely assert that OPM wrongly relied on the passover document. It is undisputed that OPM based its resolution of the appeal on an independent investigation of EPA's hiring decision—OPM questioned Beeson and others about the matter and consulted with its General Counsel. Against this background, the mere fact that OPM possessed and read the passover document did not compel the district court to hold a trial on the issue of OPM's possible reliance on that document in resolving the appeal. Hubbard simply did not provide enough factual material on this issue to escape a summary dismissal of his Privacy Act damage claim.[8]

### III.*

Hubbard's next claim stems from his assertion that Beeson rejected his job application in part because he communicated with the press during the Capitol Hill drug investigation. Hubbard contends that these press contacts constituted 'protected speech' and that in basing his rejection decision on Hubbard's exercise of such speech, Beeson violated Hubbard's first amendment rights. Hubbard seeks damages from Beeson personally under the *Bivens* doctrine. The district court dismissed this claim, holding that the Supreme Court's decision in *Bush v. Lucas,* 462 U.S.

---

**8.** Because our resolution of the causation issue disposes of Hubbard's section 552a(g)(1)(C) claim, we need not decide whether the passover document was a "record" within a "system of records" or whether it was "inaccurate."

Hubbard also appeals the district court's rejection of his Privacy Act section 552a(e)(2) claim, which requires agencies to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2) (1982). Hubbard claims that Beeson used information derived from his conversation with re-

porter Kiernan to reject Hubbard and failed to ask Hubbard about press leaks before rejecting his application. These allegations, however, do not make out a section 552a(e)(2) violation. The Act does not forbid Beeson from using relevant information from third parties in the hiring decision, and Beeson did make a "practicable" effort to collect information from Hubbard himself when he asked Hubbard whether he knew the source of the leaks in the drug investigation.

\* Vacated by order granting rehearing en banc, infra at 15.

367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) precludes a *Bivens* suit in this situation.

We begin our analysis with *Bush,* which held that a federal employee was precluded from bringing a *Bivens* action for damages against his superiors for a demotion prompted by his remarks to reporters. The Court assumed *arguendo* that the plaintiff's first amendment rights had been violated and that "civil service remedies were not as effective as an individual damages remedy and did not fully compensate him for the harm he suffered," *id.* 462 U.S. at 372, 103 S.Ct. at 2408 (footnotes omitted). Since Congress, in enacting the Civil Service Reform Act ("CSRA"), had neither expressly authorized a supplemental *Bivens* remedy nor expressly precluded it by declaring the existing statutory remedies exclusive, the Court was free to devise an appropriate remedy for a violation of a constitutional right. But in making this common law remedial determination, the Court was nonetheless bound to consider "special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.* at 378, 103 S.Ct. at 2411. The Court adopted Justice Harlan's suggestion in his concurrence in *Bivens* that "the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express[ed] statutory authorization of a traditional remedy." *Bush,* 462 U.S. at 376, 103 S.Ct. at 2410 (quoting *Bivens,* 403 U.S. at 407, 91 S.Ct. at 2010).

Basic to the Court's analysis of "special factors" in *Bush* was its recognition that "[f]ederal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed." *Id.* 462 U.S. at 385, 103 S.Ct. at 2415. The Court concluded:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system

that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff. The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights.

....

... In all events, Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service....

*Id.* at 388–89, 103 S.Ct. at 2416–17.

To be sure, *Bush* addressed different facts. The plaintiff was a federal employee who suffered a demotion and therefore was entitled to much more elaborate procedural protections than is Hubbard; *inter alia,* 30 days written notice of a removal or demotion, accompanied by the agency's reasons and a copy of the charges; review of the initial decision through the Civil Service Commission's appeals process; and judicial review. *Id.* at 386–88, 103 S.Ct. at 2415–17. By contrast, Hubbard, who was merely an *Applicant* who suffered a *rejection,* had available only an appeal of the passover decision to the Office of Personnel Management, *see* 5 U.S.C. § 3318(b)(1) (1982), and a petition alleging a "prohibited personnel practice" to the Office of Special Counsel ("OSC") of the MSPB, *see* 5 U.S.C. § 1206 (1982). *See also* 5 C.F.R. §§ 1250–1261 (OSC Regulations) (1986). Hubbard urges that our prior cases establish that these more limited remedies cannot preclude a *Bivens* claim and that *Bush* neither compels nor suggests such a preclusion. We address the latter question first, considering the relief he requests in light of the analytic framework established in *Bush.*

We agree that *Bush* left open the question, 462 U.S. at 378 n. 14, 103 S.Ct. at 2412 n. 14, whether the court should imply a damage action in the absence of "any other remedy" to vindicate a constitutional right.[9] But Hubbard is not without "any other remedy"—he has the remedy that Congress regarded as appropriate in light of his status as a veteran whose job application was rejected: an OPM review of his passover document and a petition to the OSC. That the hiring decision implicates free speech concerns does not alter the matter. The CSRA expressly entertains complaints by job applicants of constitutional violations.[10]

Hubbard is not entitled as a matter of right to the full panoply of an adversary procedure and judicial review under CSRA because the alleged harm he suffered was not serious enough, in Congress' view, to require those procedures. Congress was concerned about "the respective costs and benefits" of federal personnel-related litigation, *Bush*, 462 U.S. at 388, 103 S.Ct. at 2417, and therefore carefully calibrated the degree of procedural protections available under CSRA to the severity and motivation of the action complained of. *See Pinar v. Dole*, 747 F.2d 889, 907 (4th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985) ("In enacting the CSRA Congress intentionally designed the remedial provisions of the Act to provide employees with differing amounts of process

depending on the seriousness of the personnel action taken."). As we explained in *Carducci v. Regan*, 714 F.2d 171 (D.C.Cir. 1983), CSRA establishes three levels of personnel actions, and provides different remedies for each level:

(1) for major personnel actions specified in the statute ("adverse actions"), direct judicial review after extensive prior administrative proceedings;

(2) for specified minor personnel actions infected by particularly heinous motivations or disregard of law ("prohibited personnel practices"), review by the Office of Special Counsel with limited judicial scrutiny; and

(3) for the specified minor personnel actions not so infected, and for all other minor personnel actions, review by neither OSC nor the courts.

*Id.* at 175.

Hubbard was not punished for alleged misconduct (an "adverse action") but was instead rejected for employment via a decision allegedly infected by improper motivations. Congress decided, in this instance, that only minimal process was due. We do not believe that we should attempt to improve upon its judgment.

Quite apart from the desirability of deferring to Congress' design of a comprehensive scheme, the Court in *Bush* also analyzed the effect that civil damage actions would have on the incentive struc-

---

**9.** In his concurrence, Justice Marshall would have broadened the inquiry to ask whether a damage action would lie where the available remedy is not "substantially as effective as a damage action," *Bush*, 462 U.S. at 390, 103 S.Ct. at 2418. But as this was not the inquiry established by the full Court, it does not dictate the result here.

**10.** Hubbard argues that his complaint was not appealable within the CSRA system because (1) he was a job *applicant* and not a federal *employee*, and (2) his complaint involves constitutional issues, not mere personnel questions. Yet Hubbard's complaint does properly fall within the CSRA remedial system. 5 U.S.C. § 2302 defines the "prohibited personnel practices" CSRA is designed to remedy. In this section, "appointments" are included within the class of 'personnel actions' covered by CSRA. *Id.* at § 2302(a)(2)(A)(i). And section 2302(b)(11) de-

fines "prohibited personnel practice" to include actions that violate "any law ... directly concerning the merit system principles...." One such principle is that "applicants for employment should receive fair and equitable treatment ... with proper regard for their ... constitutional rights." 5 U.S.C. § 2301(b)(2) (1982). A hiring decision that violates the first amendment would therefore be a "prohibited personnel practice." Indeed, in *Pinar v. Dole*, 747 F.2d 899, 906 (4th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985), the Fourth Circuit concluded that first amendment-based complaints could be brought to OSC as "prohibited personnel actions." *See also Bush*, 462 U.S. at 386, 103 S.Ct. at 2415 ("[c]onstitutional challenges to agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within [the CSRA] system.")

ture [11] of civil service management as a "special factor[ ] counseling hesitation before authorizing a new kind of federal litigation." *Bush*, 462 U.S. at 378, 103 S.Ct. at 2411. Presented with strong arguments from the government as to the negative effects on legitimate supervision of the threat of subordinates' damage actions, Justice Stevens said:

> The costs associated with the review of disciplinary decisions are already significant—not only in monetary terms, but also in the time and energy of managerial personnel who must defend their decisions.... [I]t is quite probable that if management personnel face the *added risk* of personal liability for decisions that they believe to be a correct response to improper criticism of the agency, they would be deterred from imposing discipline in future cases.

462 U.S. at 388–89, 103 S.Ct. at 2417 (emphasis added). The *Bush* logic, focusing as it does on incentives and disincentives of supervisors, goes further than its express holding and necessarily precludes a *Bivens* action even where an employee's CSRA remedy does not guarantee judicial review. This is so because exposing federal supervisors to personal damage awards for some personnel actions, but not others, will inevitably cause distortion in personnel decision-making—distortion, because the supervisor invariably has a choice between actions that will immunize him against a potential damage action and those that will not. The supervisor will naturally tend to choose the less risky course. Thus, "[i]f inflicting minor discipline (or harassment) redressable only by petition to the OSC could give rise to a damage action whereas inflicting stronger penalties could not, supervisors would have an obvious incentive to choose the more draconian punishment when it might not be appropriate." *Spagnola v.*

*Mathis*, 809 F.2d 16. (Silberman, J., concurring and dissenting) at 32. Imposition of *Bivens* liability in this case would similarly distort *hiring* decisionmaking. Granting federal job applicants a *Bivens* remedy for "wrongful rejections" would create the following anomaly: henceforth, if a federal hiring official refuses to hire a job applicant because of concerns about the applicant's prior speech, he could be personally liable for damages. But if he hires the applicant and shortly thereafter fires him because of these same concerns, *Bush v. Lucas* would shelter him from personal liability.

Judge Wald, in her concurrence, contends that a *Bivens* remedy should be recognized *unless* the plaintiff has injunctive relief available. And she further argues that her proposed exception, which presumably would reduce the number of actual successful *Bivens* actions brought against supervisors, should eliminate our concern about causing distortion in supervisory behavior. We disagree. At the time a supervisor makes a hiring or disciplinary decision, he does not know whether injunctive relief will ultimately be available to the potential plaintiff—the plaintiff may either stay at the agency and seek equitable relief or obtain employment elsewhere and seek only damages.[12] As long as the possibility of personal liability is out of the decisionmaker's control (because the future availability of injunctive relief is out of his control) the decisionmaker would have an incentive to "play it safe" and make only personnel decisions that shelter him from *Bivens* liability. In other words, the existence of a damage remedy, albeit for what may turn out to be a small number of cases, would almost surely have a vastly disproportionate impact on the congressional scheme. To use the Supreme Court's terms, the "costs" would far outweigh the "benefits."

---

11. For a discussion of the Supreme Court's increasing attention to the consequences of its decisions upon future incentives and disincentives, see Easterbrook, *The Supreme Court, 1983 Term, Foreword: The Court and the Economic System*, 98 Harv.L.Rev. 4 (1984).

12. Indeed, under Judge Wald's theory, if the supervisor subsequently retires or is transferred (as apparently happened in *Spagnola* ) he may inadvertently expose himself to *Bivens* liability.

Although the *Bush* Court did not reach the question with which we are presented—whether there is a fundamental incompatibility between the CSRA remedial system and a supplemental *Bivens* remedy (however conditioned)—it was certainly aware of the dangers associated with imposing a "new species of litigation" on the civil service. The Court was also mindful that Congress is far better equipped than any court to assess those dangers and to strike the optimum balance between governmental efficiency and the rights of employees. We do not believe this "special factor counseling judicial restraint" is any less compelling today than it was three years ago.

Hubbard suggests that other cases of the Supreme Court and this Circuit compel a different result. But his analysis of the cases rests upon a misunderstanding of *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), which held that a plaintiff may not bring a *Bivens* action if either (1) defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress," *Id.* 446 U.S. at 18, 100 S.Ct. at 1471 (quoting *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2005), or (2) Congress provided an alternative remedy that it "explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Id.* 446 U.S. at 18, 100 S.Ct. at 1471. Hubbard ignores the alternative nature of this two-pronged test; a court should deny a *Bivens* claim if defendants establish the existence of either prong. *Bush* relied solely on the first ("special factors") prong of the *Carlson* test to preclude a *Bivens* action. Because *Bush*'s special factors reasoning alone precludes Hubbard's *Bivens* claim, his argument that CSRA fails to meet the "alternative remedy" prong of the *Carlson* test, even if correct, does not influence our holding.

Prior cases of this Circuit are therefore not controlling. *Cutts v. Fowler*, 692 F.2d 138 (D.C.Cir.1982) and *Borrell v. United States International Communications Agency*, 682 F.2d 981 (D.C.Cir.1982) antedate *Bush* and base their holdings on the alternative remedy prong, not upon the special factors prong. Moreover, *Cutts* and *Borrell* both upheld the availability of *injunctive* claims, neither involved the very different question of *damage* claims.

Nor have this court's post-*Bush* cases squarely addressed the issue before us today. In *Bartel v. FAA*, 725 F.2d 1403 (D.C.Cir.1984), briefed before the decision in *Bush*, we vacated and remanded the district court's entry of summary judgment against Bartel on her claim for injunctive and monetary relief. Rather than draw speculative inferences from the plaintiff's *pro se* complaint, we instructed the district court to determine "which [Bartel's] alleged violations are administratively remediable and hence barred in this case" under *Bush*. 725 F.2d at 1415 n. 21. *Bartel* left open the very issue we decide today.

*Williams v. IRS*, 745 F.2d 702 (D.C.Cir. 1984) (per curiam), *Krodel v. Young*, 748 F.2d 701 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), and *Reuber v. United States*, 750 F.2d 1039 D.C.Cir.1984) likewise address different issues. In *Williams*, we reversed the dismissal of a first amendment claim, but stressed that the plaintiff was seeking only declaratory and injunctive relief not "damages as a substitute for or supplement to civil service remedies." 745 F.2d at 705. In *Krodel*, we held that *Bush* mandated the dismissal of a federal employee's *Bivens* claim for damages against his superiors in their individual capacities because the employee "enjoyed a comprehensive statutory forum for his [constitutional] claims ... in a dispute arising out of his employment relationship." 748 F.2d at 712–13.[13] And in *Reuber*, we reversed the district court's dismissal of a *Bivens* Claim brought by an employee of a government contractor, but central to our holding was .

---

**13.** Although dictum in a footnote implied that a statutory right to petition the OSC, without more, would not preclude a *Bivens* claim for damages, 748 F.2d at 712 n. 6, that point was not at issue in the case.

the fact that Congress had not provided a remedial scheme to cover private employers doing business with the government. *See* 750 F.2d at 1058–59.

In sum, *Bush* controls the outcome of this case because the personnel action about which Hubbard complains is remediable under CSRA and his cause of action, under close analysis, actually undermines the CSRA remedial system. Consequently, we think it improper to recognize a supplemental *Bivens* remedy.[14]

## IV.

Hubbard brings a similar first amendment-based claim against EPA seeking reinstatement. The district court apparently relied on *Bush* as authority for dismissing this claim as well. But *Bush* only precludes damage claims against individuals, not equitable claims against agencies. Thus, we must go further to assess the viability of Hubbard's claim against EPA. Assuming *arguendo* that Hubbard makes out a violation of the first amendment, we must determine whether reinstatement is among the remedies he may seek.

Because 5 U.S.C. § 702 (1982) waives sovereign immunity from suits not seeking money damages, federal courts have jurisdiction to grant equitable relief to remedy agency violations of constitutional rights. "[There is a] presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Bivens*, 403 U.S. at 404, 91 S.Ct. at 2008 (Harlan, J., concurring). *See also Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). In particular, this Circuit has recognized the right of a federal job applicant to seek injunctive relief from an agency's violation of his constitutional rights in general, *Bartel v. FAA*, 725 F.2d 1403, 1415 (D.C.Cir.1984),[15] and his first amendment rights in particular, *Reuber v. United States*, 750 F.2d at 1061; *Id.* at 1065–68 (Bork, J., concurring); *Williams v. IRS*, 745 F.2d at 705.

Reinstatement clearly is among those equitable remedies available to Hubbard. *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50

**14.** Four other Circuits addressing the issue presented in this case have reached this same conclusion. *See, e.g., Pinar v. Dole*, 747 F.2d 899 (4th Cir.1984); *Hallock v. Moses*, 731 F.2d 754 (11th Cir.1984); *Braun v. United States*, 707 F.2d 922 (6th Cir.1983); *Broadway v. Block*, 694 F.2d 979 (5th Cir.1982). The Ninth Circuit, in a 2–1 decision, recently granted a *Bivens* remedy to a similarly situated plaintiff. *Kotarski v. Cooper*, 799 F.2d 1342 (9th Cir., 1986). Yet because we believe that decision misinterprets *Bush* and fails to consider fully the disruptive influence of *Bivens* actions on the civil service, we find its conclusion unpersuasive.

**15.** Allowing federal employees and applicants to seek equitable relief in federal courts for allegedly unconstitutional personnel actions suggests an "end-run" problem similar to that discussed as a special factor in our *Bivens* analysis above. The Fourth Circuit has held that CSRA is the exclusive remedy for federal employees complaining of unconstitutional "prohibited personnel practices." *Pinar v. Dole*, 747 F.2d at 909–12. That court quoted *Carducci*'s description of CSRA's comprehensive remedial system, then concluded: "[t]he absence of a provision for direct judicial review of prohibited personnel

actions among the carefully structured remedial provisions of the CSRA is evidence of Congress' intent that no judicial review in district court be available for the actions involved in this case." *Id.* at 910.

Yet the rule in this Circuit, which has been repeatedly applied, is clearly different: CSRA does not preclude federal employees from seeking equitable relief against agencies for allegedly unconstitutional personnel actions. *See Bartel v. FAA*, 725 F.2d at 1415; *Cutts v. Fowler*, 692 F.2d at 140; *Borrell v. United States Int'l Communications Agency*, 682 F.2d at 990.

The courts' power to impose equitable remedies against agencies is broader than its power to impose legal remedies against individuals. *Bivens* actions are a recent judicial creation and, as *Carlson v. Green* made clear, comparatively easy for Congress to preempt. The court's power to enjoin unconstitutional acts by the government, however, is inherent in the Constitution itself, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Although Congress may limit this power, *see Ex Parte McCardle*, 74 U.S. (7 Wall.) 506 19 L.Ed. 264 (1869), CSRA did not explicitly limit our jurisdiction to enjoin unconstitutional personnel actions by federal agencies.

L.Ed.2d 471 (1977), establishes that reinstatement may be had in a constitutional case involving employment: "[A state employee] may ... establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected ... freedoms." *Id.* at 283–84, 97 S.Ct. at 574. This long-standing principle has also been applied to the federal government. *See, e.g., Reuber v. United States,* 750 F.2d at 1062; *Id.* at 1067 (Bork, J., concurring). Hubbard is therefore entitled to reinstatement in the position he sought if he can show that EPA's rejection of his job application violated his first amendment rights. The district court erroneously relied on *Bush* to dismiss Hubbard's first amendment-based reinstatement claim, apparently without considering the merits.

■ Given the numerous factual issues in dispute concerning Hubbard's first amendment claim, we think summary judgment for either party is improper at this stage. Hubbard claims Beeson rejected his application because Hubbard discussed the Capitol Hill drug investigation with the press. Yet the parties disagree about whether Hubbard's press communications were authorized—a critical issue affecting whether his speech was protected or instead was an unprotected act of insubordination. *See Connick v. Myers,* 461 U.S. 138, 151–52, 103 S.Ct. 1684, 1692–93, 75 L.Ed.2d 708 (1983). In its defense, EPA argues that Beeson justifiably rejected Hubbard because of his memo to Congressman Dornan. But as we have noted, the parties disagree about when Beeson learned about the memo and what part this knowledge played in his hiring decision. Because material issues exist concerning Hubbard's first amendment claim against EPA, we remand this claim to the district court for further proceedings.

*Affirmed in part and reversed in part.*

WALD, Chief Judge, concurring in the judgment:

I join the majority in affirming the District Court's dismissal of Hubbard's Privacy Act and *Bivens* claims, and in reversing the dismissal of his first amendment claim for equitable relief. I am very troubled, however, by the majority's language, at 5, to the effect that the Privacy Act must be stingily construed and not given its full scope in federal personnel cases; I note as well my disagreement with the reasons given for denying Hubbard's *Bivens* claims. In my view, the majority has selectively picked some language and ignored other language from the Supreme Court's opinion in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), and denigrated the thrust of a clear line of prior decisions in this court, in order to conclude that the threadbare remedy of petitioning the Office of Special Counsel (OSC) to use its wholly discretionary power to remedy prohibited personnel practices precludes a federal employment applicant whose constitutional rights have been violated from bringing an action for damages.

**I.**

The majority correctly focuses on the Privacy Act's requirement that a plaintiff demonstrate a causal link between the erroneous record complained of and his injury. I join its analysis in Part II insofar as it concludes that in this case, Hubbard has failed to demonstrate that the errors in the passover document were the cause of, rather than an attempt to rationalize, the decision not to hire him. I do not agree, however, with the majority's suggestion that serious consideration of a Privacy Act claim in the context of a federal personnel dispute somehow creates a potential conflict with the Civil Service Reform Act (CSRA). Nothing in the wording or legislative history of either Act suggests that is so. Congress recognized clearly that in both Acts, federal employees were primary beneficiaries of its actions. Decisions in this circuit since the passage of the CSRA have, moreover, without a hint of the majority's caution, reviewed the Privacy Act claims of federal employees or applicants embroiled in personnel disputes. *See, e.g., Molerio v. FBI,* 749 F.2d 815, 826 (D.C.Cir.

1984) (affirming dismissal of Privacy Act § 552a(g) claim because petitioner did not "establish that the reason he was not hired was the erroneous report"); *Albright v. United States,* 732 F.2d 181 (D.C.Cir.1984); *Borrell v. United States Int'l Communications Agency,* 682 F.2d 981, 992–93 (D.C. Cir.1982) (affirming dismissal of CSRA claim for want of jurisdiction, but allowing whistleblower's claim under § 552a(g) to go forward). The majority's citation of *Albright* to support its proposition that the Privacy Act should not be used to review federal personnel controversies is misleading: in that case this court found only that federal employees denied promotions had failed to prove causation in their Privacy Act claim because their emotional distress was more likely due to the substantive decision not to promote them than to the videotaping of a meeting, the only Privacy Act violation alleged. The court never questioned the availability of a Privacy Act remedy, if causation could be shown. My concern, of course, is that by its dicta, the majority opinion seeks to initiate a canon of niggardliness in Privacy Act construction or even a presumption of nonapplication in employee disputes that will deprive that Act of its intended effect. I would vigorously resist either approach.

## II.

In Part III of its opinion, the majority advances an interpretation of *Bush v. Lucas* that would foreclose a *Bivens* action in any situation for which the CSRA provides any kind of recourse, without regard to whether the "remedy" provided is "constitutionally adequate" to the injury received. For reasons set out in much greater detail in the majority opinion in *Spagnola v. Mathis,* 809 F.2d 16, issued simultaneously with this case, I disagree with that interpretation of *Bush.* Nonetheless, I believe, for an altogether different reason, that the dismissal of Hubbard's *Bivens* claim is a correct result. Quite apart from the CSRA, we hold that Hubbard, if he proves his alleged violation, may be entitled to injunctive relief

in the form of reinstatement; because that relief would be constitutionally adequate, we should hesitate to recognize a private damage remedy against Beeson.

*Bush* emphatically did *not* hold that the varying types of administrative remedies provided by the CSRA for different kinds of prohibited personnel actions, *always* constituted a basis for denying *Bivens* actions. It held rather that the Court would not imply a supplemental damage remedy when there already existed "comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Bush,* 462 U.S. at 368, 103 S.Ct. at 2406. I read that language not as the majority does, as a description of the CSRA, but as a prerequisite finding that a court must make before denying *Bivens* relief.

The majority's analysis rests on a single phrase in *Bush,* in which the Court contrasted the extensive administrative and judicial review available to the petitioner in that case, with a hypothesized "absence of any other remedy," *see* maj. op. at 8. From that, the majority infers any remedy in the CSRA will constitutionally suffice. But the Court's opinion must be read in its entirety. At various other points in the opinion it refers to the procedures to which Bush, as a discharged employee, had recourse as "meaningful," *Bush,* 467 U.S. at 368, 103 S.Ct. at 2406; "constitutionally adequate," *id.* at 378 n. 14, 103 S.Ct. at 2412 n. 14; and "judicially reviewable," *id.* at 387, 103 S.Ct. at 2416. In this case we are dealing with an applicant for federal employment who has no remedies at all under the Act except to *petition* the OSC to look into his case and no statutory right to any kind of judicial review.

Unlike the majority here, but in accord with the majority in *Spagnola,* I read the decisions of this circuit as clearly proceeding on the premise that the limited OSC procedures available to Hubbard are not adequate for constitutional violations. *See, e.g., Barnhart v. Devine,* 771 F.2d 1515, 1526 (D.C.Cir.1985); *Williams v. IRS,* 745

F.2d 702, 705 (D.C.Cir.1984); *Borrell v. United States Int'l Communications Agency,* 682 F.2d 981, 990 (D.C.Cir.1982). One post-*Bush* decision is particularly instructive. In *Krodel v. Young,* 748 F.2d 701, 712 (D.C.Cir.1984), *cert. denied,* — U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), we applied *Bush's* "meaningful remedies" requirement, and concluded, as the majority notes, that the administrative and judicial reviews available to Krodel were sufficient to bar a *Bivens* action. But, in so doing, we carefully distinguished Krodel's situation from that governed by circuit precedent: "Krodel was thus in a different position than the appellants in [*Borrell* and *Williams*].... Those employees could not seek direct judicial review of a prohibited personnel practice not amounting to an adverse action; instead their only statutory remedy was an essentially discretionary and unreviewable petition to the Office of the Special Counsel." *Krodel,* 748 F.2d at 712 n. 6 (citations omitted).

A recent decision of the Ninth Circuit concurs in this court's prior judgments that the limited OSC procedures do not "provide[ ] 'meaningful remedies' to one whose constitutional rights have been violated." *Kotarski v. Cooper,* 799 F.2d 1342, 1346 (9th Cir.1986). In *Kotarski,* the Ninth Circuit upheld the right of a probationary federal employee to bring a *Bivens* action against his supervisors for alleged violations of his first amendment right of free speech:

> The central features of the congressional remedial system in *Bush* and of the alternative *Bivens* remedy are the right to a forum in which to establish a constitutional violation and the right to enforce significant relief if a violation is shown. Neither feature exists for the probationary employee whose only means of seeking redress is to complain to the Special Counsel.

*Id.* Hubbard, like Kotarski, is entitled to meaningful protection of his constitutional rights; exclusion from all meaningful remedies under the CSRA cannot automatically result in the eradication of his constitutional rights as well.

The implications of the majority's preclusion of a *Bivens* remedy for *any* constitutional wrong suffered by a federal employee are staggering. Its analysis would permit a federal manager to deny employment, or to harass an employee to a point short of actual demotion, solely because that manager disagreed with the target's political viewpoints or expressions or his exercise of constitutionally-protected freedoms, without affording the injured party any recourse other than a purely discretionary and unreviewable petition to an administrative office in the personnel branch of the government. The injured applicant would never get a hearing and no Article III judge would ever see the case. Nothing in the history or language of the CSRA even remotely suggests this is what Congress meant to do.[1]

Hubbard's *Bivens* action ultimately fails, however, because of a "special factor counselling hesitation," *Bivens,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971), which was not present in *Bush:* the availability to Hubbard of injunctive relief from the agency by way of reinstatement (or more accurately the original position he was denied). *See* maj. op. Part IV. Two of our sister circuit courts have held that the availability of statutorily-based injunctive relief in the form of reinstatement and back pay is a "special factor" which bars *Bivens* actions. *Heaney v. United States,* 756 F.2d 1215 (5th Cir.1985) (Veterans Administration regulations providing for injunctive relief and judicial review); *Gleason v. Malcolm,* 718 F.2d 1044 (11th Cir. 1983) (Administrative Procedure Act remedy including reinstatement and back pay). The availability of injunctive relief here counsels against allowing a *Bivens* action as well.

---

1. It is important to note that although in this case injunctive relief may be available to Hubbard, in many cases, particular circumstances would foreclose that possibility, confronting petitioners with "damages or nothing." *See, e.g., Spagnola,* at n. 8 (citing *Bivens,* 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring)).

In *Bush*, the Supreme Court acknowledged that the CSRA was not a congressional enactment "expressly preclud[ing]" *Bivens* remedies, nor was it "as completely effective as a *Bivens*-type action." 462 U.S. at 373, 377, 103 S.Ct. at 2409, 2411. "In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.* at 378, 103 S.Ct. at 2411. After *Bush*, then, courts should look at pre-existing as well as CSRA remedies to see if they should preclude *Bivens* relief. *Bush* does indeed suggest that where that combination of remedies is "constitutionally adequate" the special context of federal employment relationships constitutes a special factor counselling hesitation. *Id.* at 378 & n. 14, 103 S.Ct. at 2411 & n. 14. Judicially imposed injunctive relief, where available, is clearly a constitutionally adequate, albeit incomplete, remedy for plaintiffs complaining that federal agencies have made hiring decisions on constitutionally impermissible grounds.[2] Indeed, in *Bush*, the plaintiff's ultimate relief, obtainable through an administrative hearing and judicial review which the Court found to be adequate, consisted of reinstatement and back pay. *Id.* at 371, 103 S.Ct. at 2408.[3]

## ORDER

PER CURIAM.

The *sua sponte* suggestions for *en banc* consideration have been circulated to the full Court. A majority of the judges of the Court in regular active service have voted in favor of the suggestions. Accordingly, it is

ORDERED, by the Court *en banc*, that the issue at Part II of the opinion of December 5, 1986 in *Spagnola v. Mathis*, 809 F.2d 16 and at Part III of the December 5, 1986 opinion in *Hubbard* will be considered and decided by the Court sitting *en banc*. It is

FURTHER ORDERED, by the Court *en banc*, that Part II of the December 5, 1986 opinion in *Spagnola* and Part III of the December 5, 1986 opinion in *Hubbard* be, and the same hereby are, vacated. All other parts of the opinions remain as issued on December 5, 1986.

A future order will govern further proceedings herein.

---

2. If Hubbard can show that the EPA's rejection of his job application violated his first amendment rights, he is entitled to injunctive relief against the agency. That relief would include, at a minimum, reinstatement in the position he sought. *See* maj. op. Part IV. Whether Hubbard may also be entitled to back pay as an incident to the equitable remedy of reinstatement is a more difficult question. *Compare Gleason v. Malcolm*, 718 F.2d 1044, 1048 (11th Cir.1983) (federal employee is barred from bringing a *Bivens* action because "she could have sought equitable relief, *i.e.,* reinstatement and back pay, pursuant to the Administrative Procedure Act"); *Gurmankin v. Costanzo*, 626 F.2d 1115, 1122 (3d Cir.1980) ("The prayer for back pay is not a claim for damages, but is an integral part of the equitable remedy of reinstatement.") *with Hostetter v. United States*, 739 F.2d 983, 985 (4th Cir.1984) (§ 702 waives sovereign immunity for reinstatement but not back pay).

3. The availability of alternate injunctive relief also distinguishes this case from *Spagnola v. Mathis*, 809 F.2d 16, where we hold that a *Bivens* action does lie against a constitutionally-violative personnel practice because of the inadequacy of the same OSC petition "remedy" involved here. Although Spagnola originally sought both injunctive relief and damages, his claim for injunctive relief became moot when the defendants ceased to be his supervisors. *See Spagnola*, at n. 8. The existence of injunctive relief against the agency should also calm the majority's worries about the anomalous incentive to impose more draconian punishment that the threat of personal liability might create for federal managers, *see* maj. op. at 9. The number of cases where a manager will face such a threat because he has invoked a sanction that does not trigger a CSRA hearing and judicial review and is also not remediable by injunctive relief, should not be substantial. In raising the distorted incentive argument, the majority views the process totally from the manager's perspective; it ignores totally the victim's stake in preserving his or her constitutional rights even where their violation takes the form of initial rejection rather than firing.