**Daniel P. MURPHY, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. CIV. A. 99–2729(JR).**

United States District Court, District of Columbia.

Sept. 27, 2001.

Roy W. Krieger, Paleos & Krieger, P.C., Washington, DC, Counsel for Plaintiff.

Meredith Manning, Assistant U.S. Attorney, Washington, DC, Counsel for United States.

*MEMORANDUM*

ROBERTSON, District Judge.

In this Privacy Act suit, a veteran Secret Service agent seeks damages for alleged Privacy Act violations that had their origins in an assault upon him by his supervisor. The government's motion for summary judgment will be granted, for the reasons set forth below.[1]

---

1. The government's earlier motion to dismiss claims under the Federal Tort Claims Act and several common law tort claims was granted on September 29, 2000.

## Background

Plaintiff Daniel P. Murphy has been a Special Agent (SA) of the United States Secret Service since 1984. At all times relevant to this lawsuit, he was one of three SAs assigned to the Secret Service's Portland, Maine, Residence Agency (PRA). The other Portland SAs were Kevin T. Flynn and Resident Agent Supervisor (RAS) Michael D. Magalski. This entire lawsuit stems from a work-related dispute between RAS Magalski and SA Murphy.

### A. Dispute and Investigation

On February 26, 1998, RAS Magalski walked into SA Murphy's office to give him an assignment. Am. Compl. ¶ 6. SA Murphy refused the assignment, stating that he was working on another task and that, in any event, the assignment "presented little involvement in the PRA district." *Id.* Upon hearing SA Murphy's refusal, RAS Magalski "exploded in anger and delivered a tirade of profanity directed at Plaintiff, punctuated by instances of finger jabbing ... toward Plaintiff." *Id.* The episode culminated in "RAS Magalski advancing towards Plaintiff and physically challenging him with the statement, 'What the fuck are you going to do about it?'" *Id.*

The next day, SA Murphy sent an e-mail to RAS Magalski complaining about this incident and about several other incidents of abusive behavior by RAS Magalski towards himself and Mr. Flynn. *Id.* ¶ 7. RAS Magalski forwarded the e-mail, with a notation denying wrongdoing, to his superior, Special Agent–in–Charge (SAIC) Michael Johnston, located at the Secret Service's Boston Field Office (BFO). *Id.* ¶ 10. By this time, SA Murphy had retained counsel. Counsel sent a letter to SAIC Johnston describing RAS Magalski's misconduct and demanding immediate action. *Id.* ¶¶ 11–12. SAIC Johnston conducted an investigation into the matter, ultimately determining that SA Murphy's allegations had no basis, and he recommended that SA Murphy be transferred to a different field office to avoid future problems. *Id.* ¶¶ 13–14.

There followed an extended correspondence between SA Murphy's counsel and various higher-ups in the Secret Service. At the behest of SA Murphy's counsel, the Secret Service conducted additional investigations to determine whether SA Murphy's allegations had any basis in fact, each time determining that they did not. *Id.* ¶¶ 15, 16–17, 22.

### B. Secret Service Assignments

The Secret Service requires its special agents to accept multiple geographic assignments during the course of their careers and advises applicants of this requirement during the application process. Def.'s Mem. at 3. SA trainees sign an acknowledgment that states: "If selected, I accept as a condition of employment that I may be geographically reassigned at the discretion of the Secret Service." Def.'s Ex. 13.

Plaintiff began his Secret Service career in September 1984 at the Washington, D.C. Field Office. Aff. of Special Agent in Charge (SAIC) Charles Wolford, Def.'s Ex. 6. In April 1989, the Service transferred him to the Presidential Protective Division in Washington, D.C. *Id.* In 1993, the Service transferred him to the Bush Protective Division in Portland, Maine, and then to the Resident Agency in Portland (Portland RA). *Id.*

At all times relevant to this lawsuit, SAIC Charles Wolford had direct responsibility for the staffing of Secret Service offices and the transfer of special agents. *Id.* In the fall of 1996, SAIC Wolford formed the intention to transfer plaintiff to a large field office based on his existing

career track and made a corresponding notation in the Service's career tracking system. *Id.* He communicated this intention to SAIC James Sloan, who supervised the Portland RA from Boston. *Id.* SAIC Sloan asked SAIC Wolford to delay plaintiff's transfer, both because he wanted to increase the staffing of the Portland RA and because plaintiff had a personal need to remain in Portland. Aff. of SAIC Sloan, Def.'s Ex. 16. SAIC Sloan's discussions with plaintiff "included advising him based on the information [he] had from SAIC Wolford, [that] he was currently slated for transfer to the New York Field Office." *Id.* In May 1997, plaintiff "bid" out of the Portland RA by requesting transfers to positions located in Washington, D.C. Def.'s Mem. at 6.

In 1998, SAIC Wolford again began considering transferring plaintiff, "among many other special agents." Wolford Aff. In May of that year, Deputy Assistant Director James Washington, who had ordered the fact-finding investigation into the Magalski/Murphy incident, asked SAIC Wolford whether plaintiff was slated for transfer. *Id.* SAIC Wolford responded that he intended to transfer plaintiff to the New York Field Office. *Id.* DAD Washington asked SAIC Wolford if he "could hold off on any transfer of SA Murphy because there was some sort of fact finding going on which was connected to SA Murphy." *Id.* In summer 1998, DAD Washington advised SAIC Wolford that the matter concerning plaintiff had concluded. *Id.* DAD Washington told SAIC Wolford: "I am not telling you to do or not do anything; I am just rescinding what I said before. Let what is going to happen

happen, but I want no special input on any of that. I am just rescinding what I asked you before." Dep. of DAD Washington, Def.'s Ex. 5.

In October or November of 1998, SAIC Wolford scheduled plaintiff for transfer to the New York Field Office. Wolford Aff. When SAIC Wolford made the transfer decision, he had not seen, and had no awareness of the contents of, any of the documents relied upon by plaintiff in his Privacy Act claim. Wolford Aff. II, Def.'s Ex. 7. On January 27, 1999, SA Murphy was notified that he would be transferred to the New York Field Office effective July 18, 1999. Am. Compl. ¶ 25.

SA Murphy alleges that the Secret Service failed to maintain accurate, timely and complete records about him. He alleges that four inaccurate or materially incomplete records resulted in his transfer to the New York Field Office. He alleges that the transfer has damaged his career, reputation, and income. These allegations, he asserts, make out a violation of the Privacy Act, for which he seeks damages of $500,000.

### Analysis

 I declined to dismiss this aspect of plaintiff's claim for damages under the Privacy Act, *Murphy v. United States*, 121 F.Supp.2d 21, 28 (D.D.C.2000), because the Privacy Act permits an individual to "recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record." *Hubbard v. U.S. Environmental Protection Agency*, 809 F.2d 1, 5 (D.C.Cir.1986) (emphasis in original); 5 U.S.C. § 552a(g)(1)(C).[2] The burden of

---

**2.** Section 552a(g)(1)(C) provides: Whenever any agency ... (C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications,

character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual ... the individual may bring a civil action against the agency, and the district

proof on such a claim, however, is difficult. In order to prevail, a plaintiff must show not only that records were inaccurate, but that it was the inaccuracy of the records that caused his injury.

Defendant has challenged SA Murphy's ability to sustain that burden with a motion for summary judgment. After full discovery, plaintiff has failed to meet the challenge. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). He has distilled his claim of causation (for his transfer to New York, which allegedly caused his injury) to four documents.[3] But (leaving aside questions about whether the documents are inaccurate, or whether the transfer to New York caused any injury) SA Murphy has not shown that the documents caused, or could have caused, his transfer to New York.

SA Murphy does not dispute the government's showing that the Service intended to transfer him to the New York Field Office as early as the fall of 1996, before the creation of the allegedly inaccurate documents and even before his encounter with RAS Magalski.[4] Instead, he seizes on the fact that SAIC Wolford delayed his transfer to the New York Field Office at the request of DAD Washington pending the outcome of the investigation. He reasons that "DAD Washington would not

have instructed SAIC Wolford to proceed[5] unless the Sira Report had found no evidence to substantiate Plaintiff's allegations and thereby discredit him.... *Absent the subject records Plaintiff would not have been transferred, because, as Defendant admits, to do so in the face of his pending allegations would give rise to an appearance of impropriety.*" Pl.'s Mem. at 16, 29 (emphasis added). The record support for the underlined portion of this quotation is the testimony of DAD Washington and SAIC Wolford. Both men acknowledge that to transfer plaintiff during the investigation could have given rise to an appearance of impropriety. Pl.'s Exs. 1 at 509, 13 at 13; Def.'s Ex. 5 at 25–26.

This "but for" argument is plaintiff's only response to the government's factual showing that the Service made its transfer decision before the creation of the allegedly inaccurate documents—but it does nothing to refute that showing. Indeed, plaintiff's "but for" argument does not amount logically to a *prima facie* case of causation. A very similar argument, made in the *Hubbard* case, was dismissed by the Court of Appeals as fallacious. In *Hubbard*, plaintiff argued that, because the Veterans Preference Act required the EPA to prepare a statement explaining why a veteran was not selected for a position (a "passover document"), the passover document was an

---

courts of the United States shall have jurisdiction.

**3.** (1) An email dated April 27, 1998 from SAIC Johnston to Nancy Karpowicz, of the Employee Relations Branch, indicating the results of his investigation and a recommendation for plaintiff's transfer to a field office (Def.'s Ex. 9); (2) a memorandum dated May 5, 1998 from SAIC Johnston to plaintiff notifying him of the findings of his investigation (Def.'s Ex. 10); (3) a report dated June 17, 1998 by Ronald Sira, assistant to the special agent in charge (ATSAIC), detailing his investigative findings (Def.'s Ex. 11); and (4) a memorandum dated August 6, 1998 from

DAD Washington to plaintiff reporting the findings of ATSAIC Sira and Washington's conclusions (Def.'s Ex. 12).

**4.** Plaintiff notes that other special agents had the notation "Large Field Office Recommended" in their case files in October or November 1998, but "[n]onetheless, it was Plaintiff who was singled out for immediate transfer." Pl.'s Mem. at 16. This fact, however, does not create a dispute as to SAIC Wolford's intention to transfer plaintiff.

**5.** There is no evidence that DAD Washington "instructed SAIC Wolford to proceed" with SA Murphy's transfer. *See* Def.'s Ex. 5.

integral part of the process, so that if it was inaccurate "the passover document ... caused his rejection." *Hubbard,* 809 F.2d at 6. "The fallacy in this argument lies in Hubbard's confusion between a *necessary step in* the rejection process, and *a cause of* the rejection. Although the passover document may have been a necessary step in the rejection process, it in no way influenced the substance of [the EPA's] decision to reject Hubbard." *Id.* (emphasis in original). Plaintiff's argument in the instant case contains the same fallacy. Here, as in *Hubbard,* the documents apparently played a part in the transfer process—they delayed it—but plaintiff has neither shown that they caused the transfer nor identified a genuine issue of fact that is material to the dispositive issue of causation.

An appropriate order accompanies this memorandum.

### *ORDER*

For the reasons set forth in the accompanying memorandum, it is this 27th day of September 2001,

**ORDERED** that defendant's motion for summary judgment [# 29] is **granted.**