Willard A. COVERT and Barbara Covert, husband and wife; Ramona Abbott, a single person; Ted Nichol and Yvonne Nichol, husband and wife; Jerome B. Lee and Jeannine Lee, husband and wife; Thomas G. Humphrey and Patty Humphrey, husband and wife; William P. Espinosa, Jr. and Janet Espinosa, husband and wife; Aldo Pineda and Bertha Pineda, husband and wife; Eldon Schlabach and Marlene Schlabach, husband and wife; Steven L. Bohan, a single person; Mark Studd, a single person; Larry Spurgin, a single person; Lawrence Bills and Iva Bills, husband and wife; and Earl Penor and Berneice Penor, husband and wife, Plaintiffs,

v.

John HERRINGTON, Secretary, Department of Energy, United States of America, Defendants.

No. C–86–730–JLQ.

United States District Court, E.D. Washington.

Aug. 6, 1987.

As Amended Sept. 15, 1987.

Daryl D. Jonson, Richland, Wash., James E. Egan, Kennewick, Wash., for plaintiffs.

Robert S. Linnell, Asst. U.S. Atty., Yakima, Wash., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

QUACKENBUSH, District Judge.

This is an action brought under the Privacy Act, 5 U.S.C. § 552a, by 13 contract employees or "job shoppers" at the Hanford Nuclear Reservation. Plaintiffs claimed that unlawful disclosures of their personnel security files by the Department of Energy (DOE) to the DOE Inspector General (IG) and subsequently to the United States Department of Justice led to criminal prosecutions against them. None of those prosecutions resulted in convictions, but plaintiffs claim damages including costs and attorney fees incurred in defense of the criminal prosecutions.

A bench trial was held June 23, 1987, in Richland, Washington. Appearing for plaintiffs were Daryl D. Jonson and James E. Egan; appearing for the government were Assistant United States Attorney Robert S. Linnell, as well as DOE Attorneys Carolyn Reeplog and Clyde Fitz. At this trial, the case was submitted to the court upon stipulated facts. Two exhibits were admitted: the Stipulation of Fact, including a transcript of testimony from Grand Jury proceedings in the related criminal case (Ex. 1) and the IG's Prosecutive Reports which had been provided to the Department of Justice (Ex. 2). The parties were permitted to submit additional memoranda on several issues, which has been done (Ct. Rec. 27–30).

Having considered the record, including the exhibits and Stipulation of Fact and the argument of counsel, and being fully advised in the premises, the court hereby makes its Findings of Fact and Conclusions of Law.

In late December 1982, Fourth District Congressman Sid Morrison received a letter from a constituent alleging that a number of "job shoppers," or employees of

subcontractors at the Hanford Project, were falsely claiming permanent residences more than 50 miles from the job site in order to obtain per diem subsistence payments. The complaint was ultimately referred to the DOE's IG, which began an investigation.

The target of the investigation were employees of HEPCO, Inc., and STACO, Inc., subcontractors for the DOE's prime Hanford contractors, Westinghouse Hanford Co. and Rockwell Hanford Operations. Under agreements between the contractors and subcontractors (effective October 1, 1979 for Rockwell and February 3, 1980 for Westinghouse), the subcontractors' employees were required to execute Certificates of Permanent Residence to be eligible for per diem subsistence payments.

Each Certificate of Permanent Residence acknowledged that the signing party understood he was eligible for a subsistence allowance only during such periods as he maintained two residences—a permanent residence more than 50 miles from the worksite, and a temporary one within 50 miles of the worksite. Plaintiffs herein, employees of the above-described subcontractors at various times after June 1, 1980, all signed such Certificates of Permanent Residence.

As a condition of their employment, plaintiffs were required to complete and execute forms DOE–1, "Personnel Security Questionnaire," and Supplement to Form DOE–1, which stated that "[p]ersonal information on the form(s) will be used to determine an individual's eligibility for a DOE personnel security clearance or access authorization." It also provided, in pertinent part, that

> [a]ccess to or use of the information provided is permitted *only to the authorized Federal Government investigative agencies conducting the investigations and to DOE personnel directly involved in the processing of the determination of the eligibility of the individual for security clearance or access authorization.*

(Emphasis added.) Plaintiffs all completed and executed these forms at various dates between June 1, 1980, and January 1, 1986.

In May 1985, an auditor in the DOE's IG Office, James Steven Abernethy, began an audit to determine whether about 130 job shoppers may have inappropriately received per diem payments. He examined the contract files maintained by Westinghouse and Rockwell, including the Certificates of Permanent Residence. In an attempt to verify the accuracy of information provided by the job shoppers, he also used telephone directories, Polk City Directories, the Cole Publication Cross Reference Directory, and property records from the Benton and Franklin County Assessors' offices.

A significant number of the job shoppers whose records were checked were determined to have met the requirements of Certificates of Permanent Residence, and were maintaining both permanent and temporary residences. About 30 to 35 were questionable. The audit information gathered by Mr. Abernethy was provided to IG Special Agents Donald Farmer and Richard Young, who, between June 1985 and January 1986, examined personnel security clearance files of the individuals identified in the audit. Those files were maintained pursuant to the Privacy Act, 5 U.S.C. § 552a, by the DOE's Safeguards and Security Division.

On September 9, 1985, and on various dates thereafter, Special Agents Farmer and Young examined the entire personnel security files of plaintiffs herein without a written request by, or the prior written consent of, the individuals to whom the records pertained. Disclosure of these files to the agents was not pursuant to a court order under 5 U.S.C. § 552a(b)(11), nor pursuant to a written request by an agency for law enforcement purposes under § 552a(b)(7). This court previously has determined that the IG was entitled to examine the personnel security files under the "need to know" exception of § 552a(b)(1) and 42 U.S.C. § 7138(b)(1), which vests the IG with the duty of detecting fraud or abuse in DOE programs and operations. *See* Order Denying Plaintiffs'

and Defendant's Motions for Summary Judgment (Ct. Rec. 24). The remaining issue in this case is whether the Special Agents violated the Privacy Act in turning over the Personnel Security Questionnaires (Part 1) to the Assistant United States Attorney and furnishing information therefrom to the Grand Jury without a court order or a written request from the Department of Justice pursuant to 5 U.S.C. § 552a(b)(11) and (7).

The Special Agents allegedly acted in accordance with a February 23, 1983 Memorandum from the director of the DOE's Security Division, Office of Safeguards and Security, which stated that DOE personnel security files would be made available for review by IG special investigators "in connection with official investigative matters based upon an investigator's verbal request. The IG Investigator will present appropriate credentials and, prior to conducting the file review, complete an appropriate Privacy Act form for inclusion in the personnel security file." For each file reviewed, a "File Review Log" was completed stating the purpose of the review as "law enforcement" or "background data." Parts of the personnel security files were copied and filed in the IG's Richland office.

Following their investigation, Special Agents Young and Farmer presented a Prosecutive Report for each named plaintiff herein (and certain others who were not subsequently indicted) to an Assistant United States Attorney for the Eastern District of Washington. Each Report contained details of the investigations, copies of the Certificates of Permanent Residence and copies of Part I of the Personnel Security Questionnaires (PSQ).[1] The latter included extensive details regarding present and past residences of the job shoppers under investigation, past employment and identification of relatives and their addresses. Also contained in each Report were any statements or affidavits provided by the job shoppers under investigation and a "Warning and Waiver of Rights" pursuant to which the statements were taken. Finally, each Report contained the statutes and/or regulations allegedly violated; a summary of "personal and criminal history"; a list of witnesses and expected testimony against each job shopper; and copies of the contractual provisions between the contractors and subcontractors regarding per diem eligibility. Some of the information given to the Department of Justice was public information, while other information (*i.e.*, Part I of the Personnel Security Questionnaires) was protected by the Privacy Act.

The IG's disclosure to the Department of Justice was without a written request by, or the prior written consent of, the individuals to whom the records pertained. Disclosure of these files was not pursuant to a court order under 5 U.S.C. § 552a(b)(11), nor a written request by the Department of Justice under § 552a(b)(7). The government, however, argues that disclosure to the Department of Justice and the Grand Jury fell within the "routine use" exception of § 552a(b)(3).

The government contends that "as the comparison of the information concerning [the job shoppers'] addresses and the information given on the Certificates of Permanent Residence formed the basis for the criminal prosecution, to the extent that information regarding addresses and residences was a matter of public record, there was no 'disclosure'" which would invoke the Privacy Act (Ct.Rec. 28, p. 8).[2] How-

---

1. In some cases, copies of more than one PSQ form also were provided.

2. The government has submitted, with its Supplemental Memorandum (Ct.Rec. 28), a "Summary of Public Record Information and Non-PSQ Sources" purporting to show public record information acquired during Mr. Abernethy's audit, preceding the special agents' investigation, and "other [non-PSQ] sources of information." They have also submitted a "Policy Statement" on the Department of Justice's Relationship with the IG, a "Directive" from the IG regarding referral of cases for investigative or prosecutive action, a "Memorandum of Understanding" between the FBI and the DOE's IG, and excerpts from the United States Attorneys' Manual. Plaintiffs have objected to the attempt of the Government to supplement the record at this late date with "self serving and largely irrelevant documents," particularly since they were not submitted at trial or offered into evidence. The court will not consider these additional materials. The court notes, in any event, that

ever, the PSQ played an important role in the IG's investigation. Each prosecutive report reveals that the PSQ's were checked to determine how recently the individual job shopper had lived at the "permanent" address given on a Certificate of Permanent Residence, and whether a relative currently lived at that address. In 11 of the 13 reports, the IG stated that "predicated upon the apparent discrepancy" between a Certificate and a PSQ, further investigation was done including interviews of the job shopper and/or relatives and other individuals. In the other two, it can be assumed that such discrepancies resulted in a continuing investigation (*see, e.g.*, Prosecutive Reports of Steven L. Bohan and Jerome B. Lee, "Results of Investigation").

Moreover, defendant acknowledged in its Answer (Ct. Rec. 4) that information derived from copies of documents from the personnel security files was presented to the Grand Jury and that plaintiffs were "indicted as a result of live testimony based in part on information in the individual Plaintiffs' personnel security files." In fact, Special Agents Young and Farmer testified before the Grand Jury May 5, 1986, regarding the results of their investigations, stating generally that the "permanent addresses" given on the Certificates were, in fact, the addresses of relatives. No personnel security files were actually provided to the Grand Jury.

The Grand Jury returned an Indictment against the plaintiffs named herein, which was filed May 5, 1986. The indictment charged each plaintiff with submitting a false claim to an agency of the United States (18 U.S.C. § 287), theft of government property (18 U.S.C. § 641) and making a false statement in a matter within the jurisdiction of an agency of the United States (18 U.S.C. § 1001). Only one defendant—Willard A. Covert—was brought to trial, resulting in a judgment of acquittal. Trial of this matter revealed that plaintiffs were not government employees, but employees of companies providing workers for Hanford contractors. The remaining cases were dismissed or had been subject to pretrial diversion.

In their Stipulation, the parties have agreed that each plaintiff sustained $3,000 damages, the sum each incurred in attorney fees for defense of the criminal actions. "The only issue as to these damages will be whether such damages were proximately caused by a violation of the Privacy Act." The parties have further stipulated that "[a]t a minimum, the $1,000 statutory damage provided in the Privacy Act shall be the agreed-upon damages for each Plaintiff (5 USC § 552a)." Plaintiffs agreed to submit no testimony in support of their claims for mental anguish and humiliation.

This court has jurisdiction over the parties to this action. Subject matter jurisdiction exists under 5 U.S.C. § 552a(g) and 28 U.S.C. § 1331.

The Privacy Act of 1974, 5 U.S.C. § 552a(b), provides, in pertinent part:

No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

.   .   .   .   .

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

.   .   .   .   .

(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law

---

the information in the "Summary of Public Record Information and Non-PSQ Sources" is not in itself the basis upon which the IG Special Agents determined to make a disclosure to the Department of Justice, nor does it include all information made available to the Grand Jury. It is undisputed that information protected by the Privacy Act was disclosed, and the issue is whether that disclosure was legal and proximately caused plaintiffs' injuries.

enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

.    .    .    .    .

(11) pursuant to the order of a court of competent jurisdiction.

"Routine use" is defined in subsection (a)(7) as, "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." Subsection (e)(4)(D) requires that "each routine use of the records contained in the system, including the categories of users and the purpose of such use" be published in the Federal Register at least annually as part of "a notice of the existence and character of the system of records...." Subsection (e)(3)(C) also requires that each agency maintaining record systems

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

.    .    .    .    .

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; ....

As stated above, this court has previously held that DOE's IG had a "need to know" justifying disclosure to him (as opposed to the Department of Justice and the Grand Jury) of the protected records under 5 U.S.C. § 552a(b)(1), *supra*, and 42 U.S.C. § 7138, which grants the IG access to all records necessary in the prevention and detection of fraud or abuse in DOE programs and operations. Plaintiffs now have stated for the first time that under *Andrews v. United States Veterans Admin.*, 613 F.Supp. 1404 (D.C.Wyo.1985), and other cases, "a request for disclosure of records be reviewed by the agency in each instance to determine whether or not the interest of the person requesting the record outweighs

the interest of the individual in maintaining the privacy of the records." (Ct.Rec. 27, p. 6) Plaintiffs argue that the February 23, 1983 Memorandum from the director of the DOE's Security Division, regarding verbal requests for personnel security files, gave the IG "unfettered access to Personnel Security Records, without any attempt to look at each individual request to determine the necessity for release of the records...." (Ct.Rec. 27, p. 17)

The court agrees with defendant that the balancing in *Andrews* involved the interests of parties requesting disclosure under the Freedom of Information Act with the interests of parties who were the subject of Privacy Act records. Moreover, the other two cases cited by plaintiffs in support of their argument for mandatory pre-disclosure balancing in each case, *Thompson v. Department of Transportation*, 547 F.Supp. 274, 285 (S.D.Fla.1982) and *Smiertka v. Department of Treasury*, 447 F.Supp. 221, 226 n. 35 (D.D.C.1978), are not on point. Rather, *Smiertka* addressed balancing in the context of the Privacy Act's requirement of maintaining accurate and up-to-date records, and *Thompson* discussed the balancing of an agency's resources against an individual's interests in finding that the Privacy Act does not require individual notification whenever an entry is made in a system of records.

■ However, assuming a balancing of interests is required for disclosures under the "routine use" exception, the court finds that the government had a significantly greater interest in obtaining information necessary for the detection and prevention of fraud in DOE programs and operations than the interests of plaintiffs in withholding that information. Plaintiffs have made no other argument that would dissuade the court from its opinion that § 552a(b)(1) permitted disclosure to the IG.

The propriety of disclosure by the IG to the Department of Justice and the Grand Jury is a more difficult question. The court in its Order Denying Plaintiffs' and Defendant's Motions for Summary Judgment (Ct. Rec. 24) found that genuine is-

sues of material fact existed as to whether a potential violation of law was apparent from the face of protected records, and whether disclosure [3] was compatible with the purpose for which the information was gathered, particularly where the Supplement to Form DOE–1 affirmatively represented that the information gathered would only be used for security clearance purposes.

This court also found that it was unable, on the record before the court upon summary judgment, to determine whether a "disclosure" had actually occurred under the Privacy Act or whether the information "disclosed" was already known to the government. A related issue is whether plaintiffs would have been indicted without the use of the personnel security files protected by the Privacy Act. Finally, if there was a violation of the Privacy Act, an issue exists as to whether the IG Special Agents acted willfully or intentionally. If not, the government will not be liable for any Privacy Act violations.

The resolution of the first two of these issues rests upon the definition of "record" in the pertinent statutory context and on a determination as to the categorization of the records disclosed. In determining whether the records themselves revealed a potential violation of law, as required for disclosure under the "routine use" exception as interpreted by *Doe v. DiGenova,* 779 F.2d 74 (D.C.Cir.1985),[4] the court must decide whether to use a narrow or broad definition of "records." The government argues that when applying the *DiGenova*

holding, "the Court cannot look to whether a potential violation was disclosed on the face of the PSQ's, but must determine whether a potential violation was disclosed on the face of the *entire Prosecutive Report* (Ct. Rec. 28, p. 6–7). Plaintiffs contend, on the other hand, that without a court order or written request from the Department of Justice, disclosure must be justified by a potential violation of law apparent from the face of the personnel security files alone, and that the government confuses the definition of "records" with a "system of records."

The statute defines "record" at § 552a(a)(4) as

any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph; ...

"System of records" is defined at § 552a(a)(5) as meaning

a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual; ...

Under the *DiGenova* reasoning, the language of the "law enforcement" routine use published at Appendix B (n. 4, *supra*) requires that the disclosure must have

---

**3.** The disclosure at issue here is the disclosure to the Department of Justice under the "routine use" exception of § 552a(b)(3), not disclosure to the IG, which the court has found was justified under the "need to know" exception of § 552a(b)(1). This court inadvertently stated in its Order (Ct.Rec. 24, p. 16) that there existed genuine issues as to whether disclosure to the IG was compatible with the purpose for which the information was gathered. The compatibility analysis applies to the "routine use" exception which the government invokes to justify the disclosure to the Department of Justice.

**4.** *DiGenova* addressed a "routine use" definition, as published in the Federal Register, identical to those invoked here which are found at Appen-

dix B, 47 Fed.Reg. 14,333, ¶ 1 (1982). According to that language,

In the event that a record within this system of records maintained by this agency indicates a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program pursuant thereto the relevant records in the system of records may be referred as a routine use to the appropriate agency, whether Federal, State, local or foreign, charged with the responsibility of investigating or prosecuting such violation or charged with enforcing or implementing the statute, or rule, regulation or order issued pursuant thereto.

(Ct.Rec. 10, Ex. 12.)

been related to the disclosing agency's suspicion that the protected records themselves indicated a violation of law. The provision in Appendix B contemplates that "the relevant *records in the system* of records" (emphasis added) may be disclosed for law enforcement purposes once "*a record* within this system of records" (emphasis added) indicates a violation or potential violation of law. The regulation does not say that disclosure is permitted when a protected record, in combination with other information in the possession of the agency, reveals a possible illegality.

The legislative history of the Privacy Act reveals that the statutory definition of "record" represents a compromise between the Senate bill, which covered "all personal information," and the House version which applied to "any collection or grouping of information about an individual." *Bartel v. F.A.A.*, 725 F.2d 1403, 1408 n. 9 (D.C.Cir. 1984) (citing *Source Book on Privacy* 278 (1976)).

> The final definition was formulated to "assure ... that a record can include as little as one descriptive item about an individual.... The amended definition was adopted to more closely reflect the definition of 'personal information' as used in the Senate bill." 120 Cong. Rec. 40408.... (*reprinted in Source Book, supra* at 866.

*Bartel, supra* at 1408 n. 9.

An example of a narrow interpretation of "record" is found in *Andrews, supra* at 613 F.Supp. 1410, involving a challenge by registered nurses of the disclosure of personnel records to a union official (apparently for her own personal purposes). In that case, the District Court for Wyoming found that "[t]he personnel files relating to plaintiffs were 'systems of records' covered by the Privacy Act of 1974, and the proficiency reports [contained in those files] were records contained within the system of records."

█ In light of the statutory definitions, the language of Appendix B regarding "a record ... [which] indicates a violation or potential violation of law," the legislative history and the case law, this court finds

that "record" in the case at bar refers to plaintiffs' personnel security questionnaires. It is the further finding of the court that no potential violation of law was disclosed on the face of those documents.

The next issue, then, is whether, under the "routine use" exemption, the personnel security questionnaires were disclosed to the Department of Justice for a use compatible with the purpose for which they were collected, as required by § 552a(b)(3), § 552a(a)(7). Plaintiffs stress that under the Supplement to Form DOE-1, they were told that

> [a]ccess to or use of the information provided [in the PSQ's] is permitted only to the authorized Federal Government investigative agencies conducting the investigations [regarding security clearances and access authorizations] and to DOE personnel directly involved in the processing of the determination of the eligibility of the individual for security clearance or access authorization.

This use, argue plaintiffs, is distinct from the law enforcement use to which the information was actually put.

However, the government argues that once the Special Agents obtained the personnel security records, they were no longer "Personnel Security Clearance Files," DOE System of Records-43, but became "Investigative Files of Inspector General," DOE System of Records-54. The latter "represents that portion of the files of the Inspector General which covers IG investigations of individuals. The records are used in IG investigations and for the referral of violations of law to law enforcement authorities." 47 Fed.Reg. 14,319 (1982) (Ex. 12 to Ct.Rec. 10) Thus, contends the government, "the disclosure to the DOJ of the Prosecutive Reports taken from DOE-54 ... was clearly compatible with the purpose of its collection and therefore in compliance with the (b)(3) exception." (Ct.Rec. 28, p. 11)

In support of its argument, defendant cites *Burley v. United States Drug Enforcement Admin.*, 443 F.Supp. 619 (M.D. Tenn.1977). In *Burley*, plaintiff, a licensed pharmacist, attempted to enjoin the Drug

Enforcement Administration from disclosing its investigative reports to the Tennessee Board of Pharmacy. However, the District Court found that disclosure was a "routine use" under § 552a(b)(3) and published regulations which contemplated, among other things, disclosure to "federal and state regulatory agencies responsible for the licensing or certification of individuals in the fields of pharmacy and medicine." *Id.*, at 624.

Plaintiffs distinguish *Burley* on the basis that "the description of 'routine uses' in the Privacy Act Notice of DEA specifically, clearly and blatantly authorized the disclosure" of the investigative reports. Moreover, the *Burley* court noted that there was independent statutory authority permitting the transfer of investigative reports to state licensing boards engaged in the prosecution of cases related to controlled substances. *Id.*, at 624–25.

*Burley* does not stand for the proposition that a system of records can be transmuted from one classification to another with a concomitant change in the purpose for which the records may be used. Indeed, *Burley* did not address the situation where there has been a two-fold disclosure, *i.e.*, agency "A" obtains records properly under a Privacy Act exemption, and subsequently claims that the records have thus been divested of their nature as "personnel security files" for the purposes of disclosure to agency "B". Defendant's argument, logically extended, would result in an exemption of the records from certain protections of the Privacy Act (although defendant, arguing that the requirements of the "routine use" exception are satisfied in disclosure to the Department of Justice, does not take it that far).

In its memorandum in support of summary judgment (Ct. Rec. 15), the government also cited *United States v. Miller*, 643 F.2d

713 (10th Cir.1981) as an "analogous situation." In *Miller*, plaintiff had provided certain documents to his parole officer, who subsequently disclosed them to postal inspectors and the FBI. *Miller* argued that the parole officer's disclosures violated the Privacy Act,[5] but the court found otherwise, holding that the release of the records for a criminal investigation qualified as a "routine use" under Justice Department regulations.[6]

*Miller*, like *Burley*, failed to address the government's argument that records lose their initial protected classification by one justified disclosure, for the purposes of a subsequent disclosure. *Miller* would have been analogous to the case at bar if the court had found that the *bank's* release of documents to postal inspectors was controlled by the Privacy Act, and once the inspectors turned the records over to the Department of Justice they were controlled by the department's regulations, rather than the bank's. This, of course, was not the situation in *Miller*.

Neither *Burley* nor *Miller* discuss the "routine use" requirement under § 552a(a)(7) that disclosure must be for a purpose compatible with the purpose for which a record was collected. It appears that "collection" in the statutory context applies to collection from the person providing the information, or perhaps his agent, not from another agency which has also been subject to the Privacy Act. The notice requirements of the Act, 5 U.S.C. § 552a(e)(3)(A)–(D), and § 552a(e)(4)(A)–(I), apply to the agencies maintaining a system of records, which would logically be those agencies which had collected the records. *See, e.g.*, § 552a(e)(3) which requires the agency to make certain disclosures to "each individual *whom it asks to supply information*". (Emphasis added.) These

---

**5.** It is interesting to note that, in contrast with the Appendix B regulation wording at bar (*see n. 4, supra* ), the Justice Department's regulation referred not to "a record within this system of records ... [which] indicates a violation or potential violation of law," but "*material* in this system [which] indicates a violation or potential violation of law ..." (Emphasis added.) This could arguably result in broader disclosure.

**6.** Miller had also argued that the postal inspectors or the FBI had obtained records from a bank in violation of the Privacy Act. However, the court found that the statutory definition of "agency" was not intended to encompass national banks. 643 F.2d 713, 717 n. 1. Thus, the bank's disclosure was not controlled by the Act.

are the agencies whose purposes for collection would be germane, not agencies to whom the information is subsequently transferred.

The reclassification which the government urges would strain the language of the statute and provide a means for an agency to make an "end run" around the intent of the statute. The government is not barred from access to the information for law enforcement purposes; it simply must comply with the strictures of the Privacy Act. The Department of Justice could have made a written request for the records under § 552a(b)(7) or obtained a court order under § 552a(b)(11). Neither of these avenues was pursued.

■ The purpose for which the personnel security file data was compiled, as disclosed to plaintiffs, was solely "to determine an individual's eligibility for a DOE personnel security clearance or access authorization." Use of the information was "permitted *only* [by] the authorized Federal Government investigative agencies conducting the investigations and to DOE personnel directly involved in the processing of the determination of the eligibility of the individual for security clearance or access authorization." (Supplement to Form DOE-1, Ex. attached to Ct. Rec. 23; Emphasis added). Disclosure by the IG Special Agents to the Department of Justice was not compatible with the purpose for which the records were collected, nor with the purpose which was disclosed to plaintiffs, and thus violated the Privacy Act.

The government also has argued that there was no "disclosure" as defined by the Privacy Act. In its memorandum in support of summary judgment, defendant argued that information regarding plaintiffs' addresses, obtained by Special Agents Farmer and Young from the personnel security files, "was confirmation of the information which had been initially obtained by Mr. Abernethy through ... public sources" such as telephone books and county assessors' offices. (Ct.Rec. 15, p. 4.) "Accordingly, there was no violation of the Privacy Act for release of information confirming the plaintiffs' addresses, length of resi-

dence, and homeowner status." *Id.* If the Special Agents already had the knowledge which they presented to the Department of Justice and ultimately, in oral summary form, to the Grand Jury, then it could be argued that the information obtained from the personnel security files did not proximately result in the indictments nor in plaintiff's claimed damages.

■ However, the court is unable to accept the government's argument. An examination of the Prosecutive Reports indicates to the court that it was the discrepancy between the information given in the Certificates of Permanent Residence and that in the Personnel Security Questionnaires which led to interviews of the job shoppers, their relatives and others, as well as to further general investigation (*see*, Findings of Fact, *supra* at pp. 733–34, regarding the IG's statements that investigation was "predicated upon" those discrepancies). Perhaps the Special Agents could have gone to other sources to discredit the information given on the Certificates (indeed, Auditor Abernethy did this to a limited extent), but this misses the point. The PSQ's, in many cases, indicated to the Special Agents that the job shopper had not lived at his "permanent address" for many years; that a relative lived there instead; and that the job shopper and his family had lived for an extended period in the Tri-Cities. This information, in combination with information already possessed by the IG, then motivated further investigation and, ultimately, the referral to the Department of Justice.

Furthermore, as plaintiffs note, there is an inconsistency in the government's position regarding "disclosure" under the Privacy Act. To justify disclosure of the personnel security files to the Inspector General, the government cites a "need to know" in the prevention and detection of fraud. However, if the government already had the necessary information from public sources, its "need to know" to justify disclosure to the IG is questionable.

The Grand Jury was not given the personnel security files nor told that the special agents' information came from them.

However, the Grand Jury transcripts (Att. to Ex. 1) reveal that the Grand Jury was afforded information from those files. For example, Special Agent Young testified that while plaintiff Lawrence Bills had given a Pocatello, Idaho, address on his Certificate of Permanent Residence, "the investigation" showed that that was his father's residence. (Ex. 1, Testimony of Special Agent Young before the Grand Jury, pp. 6–7.) The Prosecutive Report for Mr. Bills states that his PSQ revealed that he had not lived at the Pocatello residence from 1965 through April 1979, and that his parents lived there. As a result of the discrepancy between the Certificate and PSQ, Mr. Bills was interviewed, and stated that he did not provide any financial support towards the maintenance of the Pocatello residence. The Grand Jury also was told that "the investigation" showed no financial maintenance provided for that house.

The court is thus compelled to find that there was an illegal "disclosure" by the IG to the Department of Justice within the meaning of the Privacy Act, and that such disclosure was a proximate cause of plaintiffs' indictments and their alleged damages.

■ The final issue which the court deems it necessary to address is whether the conduct of Special Agents Farmer and Young was willful or intentional. As the parties agree, to establish liability the plaintiffs must show that the DOE intentionally or willfully failed to comply with the requirements of the Privacy Act when it provided the Prosecutive Reports to the Department of Justice and the Grand Jury. 5 U.S.C. § 552a(g)(4)(A), (B).

The "intentional or willful" standard to be applied has been defined as "only somewhat greater than gross negligence." *Moskiewicz v. United States Dept. of Agriculture,* 791 F.2d 561, 563 (7th Cir.1986). According to the "Analysis of House and Senate Compromise Amendments to the Federal Privacy Act" at 120 Cong.Rec. 40405, 40406 (1974),

> [i]n a suit for damages, the [compromise] amendment reflects a belief that a finding of willful, arbitrary or capricious ac-

tion is too harsh a standard of proof for an individual to exercise the rights granted by this legislation. Thus the standard for recovery of damages was reduced to "willful or intentional" action by an agency. On a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct, this standard is viewed as only somewhat greater than gross negligence.

791 F.2d at 563.

It has also been held that the "greater than gross negligence" standard requires a "recklessness factor" and a "scienter factor." *Id.,* at 564. The Ninth Circuit has defined willful conduct in terms of recklessness when there has been "a reckless disregard for obvious risks." *Sorenson v. United States,* 521 F.2d 325 (9th Cir.1975). "Scienter" is discussed in the leading District of Columbia Circuit case of *Albright v. United States,* 732 F.2d 181, 189 (D.C. Cir.1984):

> The Act does not make the Government strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions. The terms "intentional" and "willful" must be interpreted in their context to determine their meaning. Under Section 552a(g)(1)(D) liability is predicated on an agency's "failure to comply" with the Privacy Act. Thus, the "intentional or willful" action requirement of Section 552a(g)(4) refers only to the intentional or willful failure of the agency to abide by the Act, and not to all voluntary actions which might otherwise inadvertently contravene one of the Act's strictures. Section 552a(g)(4) imposes liability only when the agency acts in violation of the Act in a willful or intentional manner, either by *committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.*

*Id.* (cited in *Moskiewicz,* 791 F.2d 564 (emphasis added)).

According to the government, the record before the court does not indicate that the DOE Special Agents acted without grounds for believing their conduct to be lawful, nor

that they acted with flagrant disregard for the rights of individuals. Defendant argues that the IG, having discovered potential violations of law in the discrepancies between information on the Certificates of Permanent Residence and the personnel security files, was compelled by law to report to the Department of Justice, which was done. The IG provided his Prosecutive Reports to the United States Attorney "under the (b)(3) 'routine use' exception which the Government maintains was in full compliance with the Privacy Act." (Ct.Rec. 28, p. 16.)

The government also argues that where its employees have simply followed established, accepted internal procedures, a finding of willfulness is precluded. *Moskiewicz, supra,* 791 F.2d 564 (citing *Bruce v. United States,* 621 F.2d 914 (8th Cir.1980)):

> In *Bruce* it was deemed that a government employee who violated the Act simply by following unchallenged regulations of a governmental agency could not be accused of willful and knowing violations of the Act.

In the case at bar, contends the government, the IG special agents were following guidelines set out by the Department of Justice, as well as a directive from the DOE's Office of Inspector General.

Plaintiffs, on the other hand, argue that an agency cannot, by the adoption of regulations, authorize the disclosure of records prohibited by the Privacy Act. According to *Andrews, supra,* 613 F.Supp. 1404, 1413, "[a]ny regulations enacted under the Privacy Act must be consistent with its purposes, and inconsistent regulations are invalid, and will not justify release of covered information." Plaintiffs contend that the February 23, 1983, Memorandum from the director of the DOE's Security Division stating that personnel security files would be available for IG review, based upon an oral request, is contrary to the individualized balancing process required prior to a disclosure of Privacy Act documents.

> In sum, according to plaintiffs,
>
> [t]he evidence shows that the Department of Energy initiated the investigation, obtained the personnel security records, sought out and obtained the unsolicited assistance of the U.S. Attorney's office, and voluntarily delivered over to the Department of Justice copies of the personnel security records without request and without legal compulsion or process of any kind. Where an agency initiated the conduct leading to the disclosure of information from a record within a system of records, knows of the intended use of the records and condones the same, and does so for purposes of its own and without reference to the rights of the individuals subject of the records, such conduct is willful and intentional.

(Ct. Rec. 30, p. 10.)

In an action for damages under the Privacy Act, plaintiffs have the burden of establishing that the government's actions, considered "in their context," were intentional or willful. *Laningham v. United States Navy,* 813 F.2d 1236 (D.C.Cir.1987) (citation omitted); 5 U.S.C. § 552a(g)(4). The fact that the government's actions in releasing documents could not be characterized as "inadvertent" does not meet the standard under § 552a(g)(4). "Instead, the violation must be 'so patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful.'" *Id.* Premeditated malice is not required for a finding of intentional and willful conduct. *Parks v. United States Internal Rev. Serv.,* 618 F.2d 677, 683 (10th Cir. 1980).

The cases in which circuit courts have declined to find intentional and willful conduct generally indicate an acknowledgment and weighing of the privacy interests, which did not take place in the present case. *Laningham, supra,* was an action alleging that the Navy's disclosure of plaintiff's disability records in Court of Claims proceedings violated the Privacy Act. The District of Columbia Circuit, affirming summary judgment for the Navy, noted that the Navy did not disclose the documents until after the Claims Court had issued an order permitting it to file a sealed copy of the documents. *Id.,* at 1243. Furthermore, the Navy's attorney had submitted a declaration that disclosure was

necessary both to rebut any mistaken impression created by plaintiff's partial submissions from the same set of documents, and to dispel the possibility of improper conduct in the administrative proceedings. *Id.* at 1342. No comparable considerations were present in the case at bar.

Similarly, in *Sullivan v. Veterans Administration*, 617 F.Supp. 258, 262 (D.D.C. 1985), the court found that the Veterans Administration had not acted intentionally and willfully in releasing an investigative report where the VA had attempted to redact the personally identifiable references to plaintiff, and the VA had "carefully considered plaintiff's privacy interest before releasing such report." *Id.*

The government has argued that where records are released in accordance with internal regulations and procedures, a finding of willfulness may not be made. *Bruce, supra*, 621 F.2d at 917. However, *Bruce* is distinguishable from the case at bar. In that case, records were released pursuant to a subpoena, and the court found that because the courts had not yet determined that a subpoena was not a court order for the purposes of § 552a(g)(11), the decision to release the records pursuant to subpoena could not be considered an intentional or willful violation of the Act.

In the case at bar, the IG did not attempt to procure a court order under § 552a(b)(7). Moreover, agency regulations do not in all instances shield it from liability under the Privacy Act. An agency cannot promulgate regulations which ignore the dictates of the Privacy Act. *Wisdom v. Department of Housing & Urban Dev.*, 713 F.2d 422, 424 (8th Cir.1983).

In *Wisdom*, the Eighth Circuit found that HUD's reliance on regulations was not a willful violation of the Act where the Act was still relatively new; the particular regulations never had been challenged; and HUD's conduct was not "so patently egregious and unlawful that anyone applying (the regulations) should have known they were unlawful." *Id.* at 424–25.

By contrast, the February 23, 1983 Memorandum from the director of DOE's Security Division, Office of Safeguards and Security, permitting disclosure of protected records "in connection with official investigative matters based upon an investigator's verbal request," would circumvent the Privacy Act, and the IG Special Agents could not reasonably have relied on it.

In the circumstances before the court, the IG Special Agents intentionally and willfully disclosed the Personnel Security Questionnaires, Part I, to the Assistant United States Attorney, and information therefrom to the Grand Jury. Their failure to avail themselves of the well-established procedures under the Privacy Act, *i.e.*, § 552a(b)(7) and § 552a(b)(11), amounted to a flagrant disregard for plaintiffs' rights under the Privacy Act. Furthermore, the record demonstrates that the Special Agents had no reasonable basis upon which to consider their conduct lawful.

Accordingly, the court concludes that the disclosure of plaintiffs' personnel security questionnaires to the Department of Justice was not justified by the "routine use" exception of 5 U.S.C. § 552a(b)(3), but was a violation of the Privacy Act, actionable under § 552a(g). The IG Special Agents acted intentionally and willfully in those disclosures, and their conduct proximately caused the damages to which the parties have stipulated.

Plaintiffs are each entitled to the stipulated sum of $3,000 incurred in defense of the criminal prosecutions in the United States District Court, and for costs of this action, together with reasonable attorney fees. Plaintiffs' counsel have submitted Affidavits in Support of Motion for Costs and Reasonable Attorney's Fee (Ct.Rec. 25, Ct.Rec. 26). Defendant will file and serve, no later than 20 days from the date of entry of these Findings of Fact and Conclusions of Law, any objections to the amount and reasonableness of said fees.

*IT IS SO ORDERED.*